## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

INTERVENTION ENERGY
HOLDINGS, LLC., *et al.*,

Debtors.[1]

Chapter 11

Case No. 16- _____ (\_\_\_)

(Joint Administration Requested)

## DECLARATION OF JOHN R. ZIMMERMAN IN SUPPORT OF
## <u>CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS</u>

I, John R. Zimmerman, being duly sworn, depose and say:

1.      I am the President of Intervention Energy Holdings, LLC and Intervention Energy, LLC (together, the "<u>Company</u>" or "<u>Debtors</u>") in the above captioned Chapter 11 cases (the "<u>Chapter 11 Cases</u>") and have held this position since 2007 when the Company was founded.  I am responsible for overseeing the business operations, general accounting and financial planning of the Company.  As such, I have developed substantial institutional knowledge regarding the Debtors' finances, day-to-day operations, business affairs, and books and records.

2.      I am authorized to submit this Declaration in support of the Debtors' Chapter 11 petitions and the first day pleadings described herein (the "<u>First Day Motions</u>").

3.      On the date hereof (the "<u>Petition Date</u>"), the Debtors commenced these Chapter 11 Cases by filing voluntary petitions for relief under Chapter 11 of title 11 of the United States Code, as amended (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>").

---

[1] The Debtors in these Chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows:  Intervention Energy Holdings, LLC (8131); and Intervention Energy, LLC (8131).  The mailing address for the Debtors, solely for purposes of notices and communications, is:  475 17th Street, Suite 1040, Denver, CO 80202.

4.      The Debtors remain in possession of their property and continue to manage and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee, examiner or official committee of unsecured creditors has been appointed in these Chapter 11 Cases.

5.      The Debtors have filed or anticipate filing the following First Day Motions:

    i.    *Debtors' Motion for an Order Directing Joint Administration of Their Chapter 11 Cases* ("Joint Administration Motion");

    ii.    *Debtors' Motion for Entry of an Order Extending the Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs* ("Schedules Extension Motion");

    iii.    *Debtors' Application for Entry of an Order Authorizing Employment and Retention of Rust Consulting/Omni Bankruptcy as Claims and Noticing Agent, Nunc Pro Tunc to the Petition Date* (the "Claims Agent Application");

    iv.    *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Prepare a List of Creditors in Lieu of a Formatted Mailing Matrix, and (II) Approving the Manner of Serving the Notice of Commencement* ("Creditor List Motion");

    v.    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Continued Use of the Debtors' Cash Management System, Existing Bank Accounts and Business Forms, and (II) Extending the Time to Comply with the Requirements of Section 345(b) of the Bankruptcy Code* ("Cash Management Motion");

    vi.    *Debtors' Motion for Entry of Interim and Final Orders Authorizing Debtors to Pay Wages, Compensation, and Employee Benefits* ("Wage Motion");

    vii.    *Debtors' Motion or Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Maintain Existing Insurance Policies and Pay All Insurance Obligations Arising Thereunder, and (B) Renew, Revise, Extend Supplement, Change or Enter Into New Insurance Policies, and (II) Granting Certain Related Relief* ("Insurance Motion"); and

    viii.    *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Debtors' Use of Cash Collateral (B) Modifying Automatic Stay, and (C) Scheduling a Final Hearing* (the "Cash Collateral Motion").

6.      Additionally, the Debtors anticipate filing at the outset of these Chapter 11 Cases, among other things, applications seeking authorization for the Debtors to retain certain professionals in connection with these Chapter 11 Cases and a motion to establish interim compensation procedures for such professionals.

7.      I am submitting this declaration in support of the Debtors' chapter 11 petitions and the First Day Motions.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by other members of the Debtors' management and professionals, my review of the relevant documents, or my experience with, and knowledge of, the Debtors' operations and financial condition.  If called upon, I could and would testify competently and consistently to the facts set forth herein.

8.      This Declaration provides an overview of the Debtors and the circumstances leading to the commencement of these Chapter 11 Cases.  Part I of this Declaration provides background information about the Debtors and their business operations.  Part II recounts the circumstances and events preceding the bankruptcy filings.  Part III affirms and incorporates the facts that support the relief requested in the First Day Motions.

**PART I**

**BACKGROUND**

**A.      COMPANY HISTORY AND BUSINESS OVERVIEW.**

9.      In 2007, Managing Members John Zimmerman and Nathan Ebeling, along with four other founding members, launched the Company with a pool of personal capital. Headquartered in Minot, North Dakota, the Company is now one of the largest private, non-operated ("non-op") oil and natural gas exploration and production companies focused solely on the unconventional "resource play" known as the "Bakken" which encompasses large portions of the Williston Basin.  The Company's geographic focus is almost entirely in North Dakota.

10.    With resource plays, vast geographies of hundreds and in some cases thousands of square miles become viable drilling targets.  As such, large companies that drill the wells ("Operators") must lease sufficient land to be a "designated operator" of a particular drilling spacing unit ("Drilling Spacing Unit") by state regulators. In North Dakota, that process is standardized and determined during monthly regulatory hearings where operators make their case to be a "designated operator".  A designated operator controls where and how wells will be drilled within the Drilling Spacing Unit.  As such, the Operator controls the capital expenditure ("CAPEX") pace and timing of each particular drilling unit.  Additionally, since most operators in the Bakken are public companies, having this timing control is important to the operator and is valued by the markets.

11.    As a "non-op", the Company takes smaller, non-controlling acreage positions under a Drilling Spacing Unit.  The Company leases mineral rights in the form of an oil and gas lease that represents a share of the mineral rights under a particular Drilling Spacing Unit.  Thus, the Company largely acts as a portfolio manager of the underlying assets.  The Company's portfolio currently includes fractional interests in nearly 600 producing wells across the Bakken.

12.    North Dakota adheres to a practice called "forced pooling," which means the designated operator, by law, must allow all non-op leasehold interests the opportunity to participate in all wells proposed by the operator. This forced pooling allows non-ops, such as the Company, to be guaranteed the right (but not the obligation), to participate in any well the Operator plans to drill.  In effect, while not having any specific input on any development decisions, the Company has the ability to choose to participate in each well the Operator proposes.  While the Company is responsible for its proportional share of drilling and completing costs and the ongoing production related expenses, the Company relies on the Operator to make

all day-to-day drilling decisions, as well as handle all the mandated activities related to operating producing properties.  Consequently, the non-op model is extremely capital efficient.

13.    I was tasked with building up a leasehold portfolio of oil and gas leases and at its peak, the Company's leasehold portfolio reached in excess of 50,000 net acres of oil and gas leases.  As the Bakken has been developed and economic limits of the play have been largely determined, the Company currently has approximately 13,300 net acres held by production ("HBP").  HBP status is critical in that a typical oil and gas lease will have a term (typically five years) during which a well can be drilled and if the well enters commercial production during that period, the acreage position for the *whole Drilling Spacing Unit* is deemed HBP.  This HBP status is a critical feature in the current Company leasehold portfolio.

14.    In the Bakken, a typical well is expected to produce for 30-40 years. As such, once a lease is HBP, it is locked into place with no risk of expiry for the productive life of a well. This allows the Company to benefit from new technologies.  Newer wells are becoming more efficient and cost less with each passing quarter, while at the same time generating stronger production results because of dramatically improved technology.  Research analysts have commented that the price per barrel necessary to support a new well used to be roughly $70 per barrel.  Now, many analysts feel Bakken wells can be economic at prices as low as $35 per barrel.

15.    Supported by high oil prices but buffeted by high costs, Operators pursued a strategy to drill and complete wells as soon as possible in order to maximize the number of Drilling Spacing Units they could include in the HBP category since placing only one well into a standard 1,280 acre Drilling Spacing Unit would earn the entire Drilling Spacing Unit an HBP designation and give 30 to 40 years for further development to occur in the given Drilling

Spacing Unit.  HBP status is critical for operator and non-op alike. Because the Bakken is such a vast geographic play and much of the early leasing took place in 2008-2010, drilling happened at a frenetic pace from 2011-2014 with the rig count peaking at 218 drilling rigs in May 2012 (currently, only about 28 rigs remain active in the state).  The Company refers to this 2011-2014 phase as the "HBP Frenzy".

16.     To encapsulate the HBP Frenzy, the Company received election letters from Operators (along with cost details for the proposed well) and in 2014, elected to participate in wells costing the Company $58 million. It was for anticipated situations like this that the Company entered into the Note Purchase Agreement, as defined below.  The Secured Notes were issued to fund "drillbit capital" (costs specifically associated with drilling and completing a well), while the Company continued to fund acreage acquisitions with equity capital.

17.     In 2015, IE's average net daily production was approximately 2,250 barrels of oil equivalents (BOEPD).  Daily production was up nearly 40% year/year from 2014.  Revenues in 2015 attributable to oil and gas sales (and excluding hedge gains) totaled $28.4 million.

**B.     THE DEBTORS' CORPORATE STRUCTURE.**

18.     Debtor Intervention Energy, LLC ("IE") is a wholly-owned subsidiary of Debtor Intervention Energy Holdings, LLC ("Holdings").  Holdings is a subsidiary of non-debtor Intervention Energy Investment Holdings, LLC ("IEIH").

19.     Holdings issued 22,000,001 Common Units (i) IEIH holds 22,000,000 Common Units, and (ii) EIG Energy Fund XV-A, L.P. (one of the Secured Noteholders as described below) holds one Common Unit.  The fact that one of the Secured Noteholders holds a Common Unit is significant, because, as described in further detail, under Holdings' governing documents, the commencement of a bankruptcy case of Holdings supposedly requires the unanimous consent of all holders of Common Units.

20.     In late 2012 and early 2014, with explicit permission and support from EIG (as defined below), the Company raised additional equity financing in the form of two preferred equity deals to finance further acreage acquisitions.  Holdings issued  (i) 2,467,070 Preferred A Units, and (ii) 1,499,000 Preferred B Units.

21.     IEIH is the majority equity holder of Holdings with approximately 84.73% of the equity.  The remaining approximately 15.27% of the equity is held by various business and individual investors.  A list of all of the shareholders is attached to the Chapter 11 petition of Holdings.

22.     The Company's Managing Members and Board put significant funds into both preferred equity deals along with some existing and new investors.  The Company estimates that since inception, approximately $75 million in free cash has been reinvested in the Company. Neither Management nor equity investors have at any time since inception taken dividends or cash distributions from the Company.   Furthermore, the Company's equity investors have invested approximately $32 million cash in common and preferred equity, such that the total estimated amount of capital contributed by the Company and its equity investors is over $100 million, *exclusive* of capital contributed by EIG.

## C.     THE DEBTORS' CAPITAL STRUCTURE.

23.     Prior to the Petition Date, the Debtors entered into that certain Note Purchase Agreement, dated as of January 6, 2012 (the "Note Purchase Agreement," and together with all other security instruments and other documents related to, referenced in or executed in connection with the Note Purchase Agreement, the "Prepetition Documents"), with EIG Management Company, LLC, as administrative agent, EIG Energy Fund XV, L.P. (f/k/a Energy Fund XV, L.P.), EIG Energy Fund XV-A, L.P. (f/k/a Energy Fund XV-A, L.P.), EIG Energy Fund XV-B, L.P. (f/k/a Energy Fund XV-B, L.P.), and EIG Energy Fund XV (Cayman), L.P.

(f/k/a Energy Fund XV (Cayman), L.P.) (collectively, "EIG" or "Secured Noteholders"), whereby EIG provided up to $200 million in senior secured notes (the "Secured Notes").

24.     As of the Petition Date, the principal amount outstanding under the Secured Notes is approximately $140 million (together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Note Purchase Agreement (the "Prepetition Obligations").  To secure the Prepetition Obligations, the Debtors granted a security interest in and liens on certain assets of the Debtors as described in the Prepetition Documents (the "Prepetition Liens"), including, among other things, all Inventory[2], Accounts, Equipment, Fixtures, Deposit Accounts, and Cash Collateral (collectively, subject to certain exclusions set forth in the Prepetition Documents, the "Prepetition Collateral").  Furthermore, pursuant to the Prepetition Documents, Holdings pledged 100% of its equity in IE (the "Stock Pledge").

25.     Specifically with respect to Cash Collateral, pursuant to the Prepetition Documents, EIG has a lien over all amounts from time to time held in any deposit account of the Debtors, all monies proceeds or sums due or to become due therefrom and all the Debtors' bank accounts at Wells Fargo Bank, N.A., which are subject to a Deposit Account Control Agreement, dated as of January 25, 2012, between Intervention Energy, LLC, Wells Fargo Bank, N.A., and EIG Management Company, as administrative agent under the Note Purchase Agreement. Furthermore, subject to certain exclusions, EIG also has a lien over the Debtors' rights to payment under any Contract.

26.     Following a covenant default, the Company entered into the Amendment No. 5, Forbearance Agreement and Contingent Waiver, dated as of December 28, 2015 (the

---

[2] Capitalized terms used but not defined in this paragraph shall have the definition ascribed to such terms in the Prepetition Documents.

"Forbearance Agreement") with EIG.  The forbearance period under the Forbearance Agreement expires on June 1, 2016.

## D.      SUMMARY OF HEDGING ARRANGEMENTS.

27.      To provide partial protection against declines in oil and natural gas prices, IE routinely entered into hedging arrangements ("Hedges") with BP Energy Company ("BP"). Prior to the price collapse in late 2014, IE had historically hedged varying percentages of anticipated production for two years forward.  Hedges began shortly after IE closed its senior note financing with EIG pursuant to the Note Purchase Agreement in January 2012.   In connection with the Hedges, BP, IE and EIG Management Company, LLC , as administrative agent under the Note Purchase Agreement, entered into an Intercreditor Agreement, dated as of July 20, 2012 (the "Intercreditor Agreement").

28.      IE began with the ability to hedge up to 500 barrels of oil per day ("BOPD") which has since been raised to the current threshold of 1,500 BOPD as production grew. Furthermore, IE may hedge the approved BOPD up to five years forward.  Since nearly 90% of IE's production is oil, IE has not entered into any gas Hedges to date.  Oil Hedges have typically been in the form of swap agreements and put/call option collars to establish floor and ceiling prices, respectively.   As of Petition Date, the fair market value of outstanding hedges is undetermined.

## PART II

## EVENTS LEADING TO THE FILING OF THE CHAPTER 11 CASES.

29.      Since 2014, oil and gas companies in the United States and around the world have been negatively impacted by persistent and severely distressed market conditions.   The downward spiral of commodity prices has affected all levels of the industry as evidenced by the nearly weekly bankruptcy filings of oil and gas cases in recent months.

30.     The steep drop in the price of oil and general market uncertainty have created a challenging environment for all exploration and production companies.  Since June 2014, the price of oil has dropped more than 50%, from approximately $106 a barrel to $48 a barrel as of May 19, 2016.

31.     In 2014, the Company decided to explore strategic alternatives, including a partial or full sale of the Company and reached out to ten (10) possible advisors before selecting Evercore Partners ("Evercore"). However, by the time the Company formally engaged Evercore in October 2014, the market had already begun to shift dramatically.  By December 2014, the Company, in consultation with Evercore, decided to abandon sale efforts as oil prices were continuing to decline.  Despite the distressed industry environment, the Company remained current on its financial obligations on the Secured Notes.  However, the Company remained committed to exploring strategic alternatives and continued to work closely with Evercore.

32.     Shortly prior to the Company's retention of Evercore, the Company entered into the Amendment No. 3, dated as of September 15, 2014 (the "Third Amendment"), to the Note Purchase Agreement to expand EIG's formal commitment from $110 million to $150 million to allow adequate time and runway to complete the strategic alternatives exploration.  In connection with the Third Amendment, certain elements of the positive debt covenant calculations (the "Maintenance Covenants") were amended that would later become the basis for EIG to declare a default under the Note Purchase Agreement and Prepetition Documents.  While the Company had two other firms that were willing to provide similar financing at a more favorable rate (and EIG had copies of the executed term sheets provided by those firms), EIG had convinced the Company to accept its offer in the spirit of continuing the partnership.

33.     In October 2015, EIG declared an event of default based on the Company's failure to comply with the Maintenance Covenants.  The Company did not default under any financial covenants and to date, remains fully current with all payments and fees related to the Secured Notes facility.  While the final covenant breach was not officially determined until October 18, 2015, EIG declared a covenant breach on October 1, 2015.

34.     Over the next couple of months, EIG and the Company negotiated and entered into the Forbearance Agreement, which provided among other things, that EIG would waive all defaults if the Company raised $30 million of equity capital to pay down a portion of the Secured Notes.  In connection with the Forbearance Agreement, the Debtors also amended the Intervention Energy Holdings, LLC Second Amended and Restated Limited Liability Company Agreement (the "Holdings LLC Agreement") pursuant to the Amendment No. 1 to the Holdings LLC Agreement, dated as of December 28, 2015 (the "LLC Amendment").  Significantly, pursuant to the LLC Amendment, the Holdings LLC Agreement was amended to require that "the Company shall not, without the approval of all Common Members, voting together as a single class . . . commence a voluntary case under bankruptcy, insolvency, reorganization or other similar law now or hereafter in effect, as from time to time amended . . ."  LLC Amendment, ¶ 4.  The term "Common Member" is defined in the Holdings LLC Agreement as a member holding Common Units.  As stated above, one of the Secured Noteholders, EIG Energy Fund XV-A, L.P. holds one Common Unit and, therefore, the LLC Amendment purportedly restricts the Company's ability to file for bankruptcy without such Secured Noteholder's approval.

35.     While the Company was negotiating the Forbearance Agreement, the Company and Evercore continued to meet with potential investors in early December and through early

2016 on both debt and equity opportunities. Oil prices declined to 13-year lows during January and February 2016. Even in this difficult environment the Company pressed on with potential investors in order to solicit term sheets and present them to EIG and continued to honor their financial obligations on the Secured Notes.

36.    Notwithstanding the depressed oil prices, the Company received term sheets from three separate investor groups in February 2016, copies of which were provided to EIG and were reflective of the extremely depressed price environment in January and February 2016. These term sheets reflected discounts to par debt levels commensurate with the prevailing market prices at the time.

37.    In early March 2016, the Company met with EIG and with very little review or discussion, EIG rejected all three proposals as unacceptable and not worthy of further discussion. In early May 2016, EIG also indicated that they intended to let the forbearance expire and, in fact, pressured the Company to agree to accelerate the foreclosure process thereby allowing EIG to seize the Company's assets and eliminate the existing equity account. In connection therewith, EIG indicated that they would exercise the Stock Pledge and take control of IE.

38.    The Company was ultimately informed by EIG that EIG was in the final stages of signing an agreement to purchase a different non-op Bakken asset and indicated that the Company's assets would conveniently roll up into this pending sale transaction. This made it abundantly clear to the Company of EIG's motive to accelerate the foreclosure process and explained why EIG avoided discussions regarding any other proposals that the Company received. The Company was also informed that EIG was in discussions with certain investors or partners considering investment in the Company.

39.     On March 29, 2016, the Company paid EIG the quarterly interest expense of approximately $3.5 million.  Additionally, pursuant to the terms of the Forbearance Agreement, on April 1, 2016, the Company paid EIG approximately $2.8 million for a two-month extension of the forbearance period per the Forbearance Agreement.  The Company has remained current on all interest payments to date throughout the four and half year life of the Secured Notes facility.  In accordance with the terms of the Forbearance Agreement, the Company has provided EIG weekly cash flow models that show ample cash forecasted to stay current on financing charges through the existing maturity of the Secured Notes on January 5, 2017.  Notwithstanding the Company's positive cash flow and ability to service the debt under the Secured Notes facility, EIG directly indicated it was not interested in providing any extra time for the Company to find a refinancing or equity partner.

40.     While EIG could fairly be described as a cooperative partner for the first three and half years of the Secured Notes facility, EIG's position clearly changed once they decided to build up their competing platform and became more predatory as soon as the parties entered into the Forbearance Agreement and the LLC Amendment was effective, thereby giving EIG the ability to leverage its position to the detriment of the Company's creditors and other stakeholders.  The Board of Managers of Holdings, as fiduciaries to the Company and upon consultation with the Company's counsel, believed that the commencement of a bankruptcy case was in the best interest of all stakeholders and thus authorized the commencement of these Chapter 11 Cases in order to continue to find strategic alternatives to save the Company and stave off EIG's efforts to immediately foreclose on all of its assets, including Holdings' equity in IE.

41.     The Company believes that if EIG simply allows the Secured Notes facility to run its normal course, the Company can and will refinance them with no diminution to principal amount outstanding under the facility.

## PART III

## FIRST DAY MOTIONS

42.     Concurrently with the commencement of these Chapter 11 Cases, the Debtors have filed a number of First Day Motions to minimize the adverse effects of the Chapter 11 Cases on their businesses during the pendency of the bankruptcy.  I have reviewed each of the First Day Motions and related orders (including the exhibits attached thereto) and the facts set forth therein are true and correct to the best of my knowledge, information and belief.  I believe that the relief sought in each of the First Day Motions and Orders (a) is vital to enable the Debtors to make the transition to, and operate in, Chapter 11 with minimum interruption or disruption to their businesses or loss of productivity or value and (b) constitutes a critical element in achieving a successful restructuring.

## A.     JOINT ADMINISTRATION MOTION.

43.     The Debtors seek entry of an order directing joint administration of these Chapter 11 Cases for procedural purposes only.  I believe that joint administration will also save time and money and avoid duplicative and potentially confusing filings by permitting counsel for all parties in interest to (a) use a single caption on the numerous documents that will be served and filed herein and (b) file the papers in one case rather than in multiple cases.  I understand that joint administration will also protect parties in interest by ensuring that parties in each of the Debtors' respective Chapter 11 Cases will be apprised of the various matters before the Court in both of these cases.

44.     I have also been advised that rights of the respective creditors and stakeholders of each of the Debtors will not be adversely affected by joint administration of these cases inasmuch as the relief sought is purely procedural and is in no way intended to affect substantive rights.

**B.      SCHEDULES EXTENSION MOTION.**

45.     The Debtors request an extension of the time to file their Schedules and SOFAs. The scope of the Debtors' business, coupled with the limited time and resources available to the Debtors to marshal the required information, necessitate an extension of the deadline to file the Schedules and SOFAs.  The Debtors have limited staff available to perform the required internal review of their financial records and affairs and must address the competing demands during the early days of the Chapter 11 cases, providing ample cause justifying, if not necessitating, an extension of the deadline to file the Schedules and SOFAs.

46.     Consequently, I believe it is in the best interests of the Debtors and their creditors to obtain an extension of the deadline by which the Debtors must file Schedules and SOFAs by approximately thirty (30) days, for a total of approximately sixty (60) days from the Petition Date.

**C.      CLAIMS AGENT APPLICATION.**

47.     The Debtors request that Rust Omni be appointed as the claims and noticing agent for the Debtors and these Chapter 11 Cases, including assuming full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in these Chapter 11 Cases.

48.     The Debtors have obtained and reviewed engagement proposals from two other court-approved claims and noticing agents to ensure selection through a competitive process.

The Debtors submit, based on all proposals obtained and reviewed, that Rust Omni's rates are competitive and reasonable given Rust Omni's quality of services and expertise.

49. Accordingly, the Debtors believe that it is in the best interests of their creditors, stakeholders and estates to retain the Claims Agent for these Chapter 11 Cases.

**D. CREDITOR LIST MOTION.**

50. The Debtors request that the Court (i) authorize them to prepare a consolidated list of creditors in the format currently maintained in the ordinary course of business in lieu of submitting any required mailing matrix, and (ii) approve the form and manner of notice of notifying creditors of the commencement of these Chapter 11 Cases through the mailing of the Notice of Commencement (as defined in the Credit List Motion) by Rust Consulting/Omni Bankruptcy ("<u>Rust Omni</u>" or the "<u>Claims Agent</u>").

51. The Debtors estimate that they have over 200 creditors and parties in interest on a consolidated basis. The Debtors do not presently maintain lists of the names and addresses of their creditors on an entity-specific basis. Requiring the Debtors to segregate and convert their computerized records to an entity-specific creditor matrix format would result in duplicate mailings and would be an unnecessarily burdensome task. Such a task would take the Debtors away from their ultimate objective of maximizing the value of the businesses for the benefit of creditors and other parties in interest.

52. Contemporaneously with the filing of the motion, the Debtors have filed an application to retain Rust Omni as their notice and claims agent in these Chapter 11 Cases. The Debtors believe that using the Claims Agent for this purpose will maximize administrative efficiency in these Chapter 11 Cases and reduce the administrative burdens that would otherwise fall upon this Court and the U.S. Trustee.

53.    The Debtors believe that preparing the consolidated list in the format or formats currently maintained by the Debtors in the ordinary course of business will be sufficient to permit the Claims Agent to promptly provide notices to all applicable parties.  Accordingly, the Debtors believe that maintaining their lists of creditors and equity holders in an electronic format rather than preparing and filing separate matrices will maximize efficiency, increase accuracy and reduce costs to the benefit of these estates.

E.    **CASH MANAGEMENT MOTION.**

54.    Prior to the Petition Date, the Debtors employed a cash management system to efficiently collect, transfer, and disburse the funds generated by their business operations (the "Cash Management System").  The Cash Management System facilitates the Debtors' cash forecasting and reporting and enables the Debtors to monitor and record the collection and disbursement of funds and maintain control over the administration of their Bank Accounts (as defined in the Cash Management Motion).

55.    The Debtors maintain multiple bank accounts (collectively, the "Bank Accounts") in the ordinary course of operating their business.  Revenue and other deposits from third parties are deposited into the operating account (account 5691, the "Operating Account").  All ACH and wire activity, including payroll, are made from the Operating Account.  The Debtors also maintain a commercial checking account (account 8998, the "Commercial Checking Account") for paper checks with funds that are transferred from the Operating Account.  The Commercial Checking Account maintains a zero balance as checks clear from the account.

56.    The Debtors also maintain two savings accounts, a general savings account (account 6170, the "General Savings Account") and a separate savings account (account 2814)

that currently holds a minimum $2 million balance as required by the Secured Noteholders.[3] Any excess or unused funds are transferred from the Operating Account to the General Savings Account.  If additional funds are needed for disbursements, funds are transferred from the General Savings Account back to the Operating Account.

57.      The Debtors also maintain a deposit account at the Bank of North Dakota solely for the purpose of holding funds for a cash bond against an earlier well re-entry that the Debtors attempted.  The Debtors sought to have the funds released and the account closed prepetition, however, they have listed it as an account in the Cash Management Motion out of an abundance of caution in the event the account is not closed as of the Petition Date.

58.      The Debtors seek authority to continue to use their Cash Management System consistent with their prepetition business practices and procedures.  The Cash Management System is an ordinary course, essential business practice of the Debtors.  The Cash Management System currently in place enables the Debtors to (a) closely control and monitor corporate funds, (b) ensure cash availability, and (c) reduce administrative expenses by facilitating the efficient movement of funds.  In light of the manner in which the Debtors generate and track revenues related to their operations, any disruption in the Debtors' cash management procedures will hamper the Debtors' efforts to preserve and enhance the value of their estates.  Altering the Cash Management System may disrupt payments to key vendors and employees.  Therefore, it is essential that the Debtors be permitted to continue to use their Cash Management System in accordance with their existing cash management procedures to avoid immediate and irreparable harm.

---

[3] The Debtors' two checking accounts and two saving savings accounts held at Wells Fargo Bank, N.A are subject to a Deposit Account Control Agreement, dated as of January 25, 2012, between Intervention Energy, LLC, Wells Fargo Bank, N.A., and EIG Management Company, as administrative agent under the Note Purchase Agreement.

59.     I believe that under the circumstances, the maintenance of the Debtors' Cash Management System in substantially the same form as it existed prior to the Petition Date is in the best interests of the Debtors' estates and creditors.   Preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that inevitably would be associated with any substantial changes to the Cash Management System will (a) facilitate the Debtors' stabilization of their postpetition operations and (b) assist the Debtors in their efforts to reorganize and preserve value.

60.     In order to ensure that the Debtors' vendors continue to provide services to the Debtors, it is critical that the Debtors maintain as much consistency as possible during the early stages of these cases in order to avoid serious disruption to their operations.   Changing accounts could significantly and negatively impact Debtors' cash flow as it takes a substantial amount of time to open new accounts.   Thus, to minimize disruption to the Debtors' business while in bankruptcy, the Debtors hereby request that they be permitted to continue to use their Bank Accounts with the same account numbers.

61.     In the ordinary course of business, the Debtors use a number checks and other business forms, including electronic forms and paper forms, preprinted letterhead and related documents (collectively, the "Business Forms").   Because the Business Forms were used prepetition, they do not reference the Debtors' current status as debtors in possession.   Most parties that the Debtors do business with will likely be aware of the bankruptcy filing as a result of publicity surrounding these Chapter 11 Cases or by the notice of commencement that will be provided to parties in interest.

62.     To minimize expenses to their estates, the Debtors request authority to use their Business Forms that were in existence immediately before the Petition Date.   Given that the

Business Forms were used prepetition, they do not include references to the Debtors' current status as debtors in possession.  As is the case with the existing Cash Management System, requiring the Debtors to change existing Business Forms would unnecessarily distract the Debtors from their efforts away from administering these Chapter 11 Cases and impose needless expenses on the estates, without any meaningful corresponding benefit.

63.     Due to the nature and scope of the Debtors' business operations and the number of parties with whom the Debtors deal on a regular basis, it is important that the Debtors be permitted to continue to use the Business Forms without alteration or change and without the "Debtor-in-Possession" designation.  Otherwise, the estates will be required to bear a potentially significant expense that the Debtors' believe is unwarranted.  However, once the Debtors' stock of preprinted checks are depleted, the Debtors will then replace them with checks containing the "Debtor-in-Possession" designation.

64.     Accordingly, the Debtors believe that it is in the best interests of their creditors, stakeholders and estates continue to maintain and use their existing Cash Management System, Bank Accounts and Business Forms.

**F.     WAGE MOTION.**

65.     As of the Petition Date, the Debtors' workforce is comprised of three 3 full-time salaried employees (the "Employees").  President and Managing Member, Mr. Zimmerman remains based in Minot, North Dakota while the other Managing Member, Nathan Ebeling is based in New York City.  Neither Managing Member draws or has drawn a salary since inception.  Additionally, the three-member Board of Managers, on which Mr. Zimmerman and Mr. Ebeling sit, has never received any board-related fees for their service. None of the employees are party to any collective bargaining agreements.

66.     All Employees are paid by direct deposit on a monthly basis.  As of the Petition

Date, all Employees have been paid through May 31, 2016.  The Debtors' next scheduled payroll

date is June 24, 2016.  There are no amounts owed to any Employee on account of prepetition

wages and salaries.

67.     The Debtors request that the Court enter an order, authorizing, but not directing,

the Debtors:   ((a)  to pay and/or perform, as applicable, prepetition obligations to current

employees (collectively, the "Employee Claims"); (b) to honor and continue in the ordinary

course of business until further notice (but not assume), certain of the Debtors' holiday and paid

time off policies and employee benefit plans and programs (collectively, the "Employee Benefit

Obligations"), and to pay all fees and costs in connection therewith, except as otherwise set forth

herein; (c) to reimburse Employees for any prepetition expenses that Employees incurred on

behalf of the Debtors in the ordinary course of business (the "Employee Expense Obligations");

and (d) to pay all related prepetition withholdings, and payroll-related taxes associated with the

Employee Claims and the Employee Benefit Obligations (the "Employee Taxes" and, together

with the Employee Claims, the Employee Benefit Obligations, the Employee Expense

Obligations and the Employee Taxes collectively, the "Prepetition Employee Obligations"), all as

further described in the Wage Motion.

68.     The Debtors believe, in the exercise of their business judgment, that relief is

necessary to avoid immediate and irreparable harm to the Debtors' estates.  Paying wages,

employee benefits and similar items will benefit the Debtors' estates and their creditors by

allowing the Debtors to conduct the restructuring process effectively.  Indeed, the Debtors

believe that without the relief requested herein being granted, their Employees may seek

alternative opportunities. Such a development would deplete the Debtors' already limited workforce, thereby hindering the Debtors' ability reorganize.

69.     Accordingly, the Debtors believe that it is in the best interests of their creditors, stakeholders and estates to continue to honor and pay the Prepetition Employee Obligations.

## G.     INSURANCE MOTION.

70.     In the ordinary course of the Debtors' business, the Debtors maintain various insurance programs providing coverage for, among other things, workers' compensation liability, automobile liability, crime liability, directors and officers liability, commercial general liability, operator's extra expense control of well insurance, and umbrella liability (collectively, the "Insurance Programs"). The Insurance Programs include coverage primarily from the insurance policies (collectively, the "Insurance Policies"), which the Debtors have obtained through third-party insurance carriers (collectively, the "Insurance Carriers"). As of the Petition Date, the Debtors believe they are current on all of their premium obligations arising under the Insurance Policies, however, substantially all Insurance Policies expire on June 30, 2016.

71.     The Debtors maintain the Insurance Policies in amounts and types of coverage in accordance with laws governing the multiple jurisdictions in which the Debtors do business as well as in accordance with their contractual obligations. For the policy period 2015-2016, the total annual premiums under the Insurance Policies equaled approximately $310,000.00. The coverage types, levels and premiums for these Insurance Policies are neither unusual in amount nor in number in relation to the extent of the business operations conducted by the Debtors, and are similar to businesses of a comparable size and type to those of the Debtors.

72.     As of the Petition Date, the Debtors believe that they are current on their payment obligations under the Insurance Policies, including the Insurance Policies for directors and officers liability (the "D&O Policies") which expires on August 15, 2016. Although the Debtors

believe they are current, to the extent the Debtors discover that there are any outstanding prepetition obligations due, the Debtors seek, out of an abundance of caution, authorization to make payments of Insurance Obligations plus any unforeseen deductible payment amounts for prepetition claims.

73.     Many of the Insurance Policies are scheduled to expire on June 30, 2016.  In the course of renewing their Insurance Policies over the next several months, the Debtors may (i) employ insurance consultants in their negotiations with various insurance carriers to obtain the insurance coverage necessary to operate their businesses in a reasonable and prudent manner, and to realize considerable savings in the procurement of such policies, and (ii) seek to obtain insurance premium financing in order to pay for the Insurance Policies (the "Premium Financing Obligations").

74.     The Debtors thus seek authority to pay all Insurance Obligations and Premium Financing Obligations, if any, that may become due with respect to the Insurance Policies if such payment is necessary in the Debtors' business judgment in order to avoid cancellation or interruption of insurance coverage or brokerage services.  In addition, the Debtors seek authority to revise, extend, supplement, renew, change or enter into new Insurance Policies or Premium Financing Obligations, as needed in their business judgment.

## H.     CASH COLLATERAL MOTION.

75.     To address their working capital needs and fund the costs of administering these Chapter 11 Cases, the Debtors require authorization to continue to use cash collateral (as such term is defined in section 363 of the Bankruptcy Code (the "Cash Collateral") of the Secured Noteholders.  The Debtors seek to use the cash generated from the operation of the Debtors' business or disposition of their property, wherever located, whether as original collateral or

proceeds of the Secured Assets, as set forth in the Budget to continue to operate their business during the Debtors' Chapter 11 Cases.

76.     The Debtors, with the assistance of their financial advisors, have prepared a 13-week Budget, a copy of which is attached as <u>Exhibit 1</u> to the proposed Interim Order (the "<u>Budget</u>"), which shows, *inter alia*, the Debtors' forecasted receipts and disbursements from the Petition Date through the week ending August 20, 2016.  Under the Budget, the Debtors intend to use Cash Collateral, among other things, to pay various parties in the ordinary course of business such as, employees, vendors, and utility providers and for other general corporate purposes.  In addition, the Debtors require Cash Collateral to retain and pay costs of professionals, consultants and advisors who will enable the Debtors to reorganize in a manner that maximizes value for the Debtors' estates and their creditors.  Taken together, the services provided by all of the foregoing  parties and other entities are absolutely critical to the preservation of the Debtors' business and enterprise value.

77.     As demonstrated in the Budget, the Debtors' cash position is approximately $2.3 million as of the Petition Date and is projected to improve significantly to approximately $5.7 million by week ending August 20, 2016.  The Debtors' proposed use of the cash generated from the operation of the Debtors' businesses or disposition of their property as set forth in the Budget represents a reasonable estimate of the Debtors' needs during this period of time.  The Debtors reasonably believe that the Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the Budget.  Without access to the Cash Collateral, the Debtors' entire bankruptcy cases will be jeopardized to the significant detriment of the Debtors' estates and their creditors.

78.     The Debtors' proposed use of the cash generated from the operation of the Debtors' businesses or disposition of their property as set forth in the Budget represents a reasonable estimate of the Debtors' needs during this period of time.  The Debtors reasonably believe that the Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the Budget.  Without access to the Cash Collateral, the Debtors' entire bankruptcy proceedings will be jeopardized to the significant detriment of the Debtors' estates and their creditors.

79.     Here, the Budget shows that there is no diminution in value of the Secured Noteholders' interest in the Cash Collateral.  In fact, the Debtors' cash position is approximately $2.3 million as of the Petition Date and is projected to improve significantly over the next 13 weeks and by week ending August 20, 2016, the Debtors' ending cash balance is projected to be approximately $5.7 million.  Accordingly, there is no diminution of value of the Secured Noteholder's interest in the Cash Collateral and consequently, obviates the need for any additional adequate protection.

80.     Absent the entry of an Order permitting the Debtors to use Cash Collateral to pay disbursements under the Budget, the Debtors will have insufficient funds available to operate their businesses, administer these Chapter 11 Cases and reorganize.  The Debtors believe that the terms and conditions of their use of the Cash Collateral are appropriate and reasonable under the circumstances.

*[Signature page follows]*

\*       \*       \*

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  May 20, 2016
         Minot, North Dakota

INTERVENTION ENERGY HOLDINGS, LLC
AND INTERVENTION ENERGY, LLC

By: _____
Name: John R. Zimmerman
Title:   President